IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JEAN-DENIS JEAN-EWOLL,
Inmate No. J34720,
     Plaintiff,

vs.                            Case No.: 3:15cv202/LAC/EMT

LIEUTENANT P. REYES, et al.,
     Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff, an inmate of the Florida Department of Corrections ("DOC"), proceeds pro se and in forma pauperis in this action brought under 42 U.S.C. § 1983. Presently before the court are Motions for Summary Judgment with supporting materials filed by Defendant Nurse Practicioner Marsha Nichols (ECF Nos. 69, 70, 73), and by the three other Defendants in this action, Lieutenant Peter Reyes, Captain Brandon Turner, and Officer Virgil Mason (ECF No. 82), with supporting documentation (ECF Nos. 83, 88). While Plaintiff filed a response to the latter motion for summary judgment (ECF Nos. 102–106), he defaulted on responding to Nichols' motion for summary judgment (ECF No. 96, 99). Defendants Reyes, Turner and Mason also filed a reply (ECF No. 109).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that both motions for summary judgment should be granted.

## I.    INTRODUCTION

All Defendants were employees of the DOC at Santa Rosa Correctional Institution at the times relevant to the Third Amended Complaint (ECF No. 37), which is the operative pleading.  Plaintiff claims that Defendants Reyes, Turner, and Mason used excessive force against him in violation of his Eighth Amendment rights and that Defendant Nichols was deliberately indifferent to Plaintiff's serious medical needs following the use of force, also in violation of the Eighth Amendment as well as state negligence law.  Plaintiff seeks compensatory and punitive damages and declaratory and injunctive relief.

## II.    SUMMARY JUDGMENT STANDARDS

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case

Case No.: 3:15cv202/LAC/EMT

at trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The

nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her.  *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999).  Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove.  *See* Celotex Corp., 477 U.S. at 317.  A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

Case No.: 3:15cv202/LAC/EMT

As this case comes before the court on Defendants' motion for summary judgment, the court is required to view the facts in the light most favorable to Plaintiff, the nonmoving party. *See* Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993). The court does so here, referring to Defendants' statement of facts, and taking those facts from the parties' pleadings and summary judgment materials of record. Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts. *See* Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

**(1) Supporting Factual Positions.** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

. . . .

**(4) Affidavits or Declarations.**  An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010).  Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it.  *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

III.    FACTS

In keeping with these standards, the court conveys the following as the material facts for purposes of Defendants' motions for  summary judgment.[1]   All events took place at Santa Rosa Correctional Institution.  On January 27, 2015, Plaintiff, believing

---

[1]  Though separate summary judgment motions were filed, the court will at times refer to all four Defendants collectively, largely because the facts as presented tend to have at least passing relevance to both motions.

he was going to be "gassed" with chemical agents by correctional staff, declared a

mental health emergency (ECF No. 83-1 at 18–20).[2]    Defendant Officer Mason

subsequently arrived at the cell with another officer and escorted Plaintiff to see a

mental health counselor, who counseled Plaintiff (ECF No. 83-1 at 27–28). During the

counseling session, Mason and Turner stepped into the room and stated that Plaintiff

did not really have a psychological emergency but was trying to avoid the fact that he

had been charged with the disciplinary infraction of masturbating in front of a female

officer (*id.* at 28–29, 32–35).[3]    According to Plaintiff, Mason also threatened that he

would starve him, beat him and gas him, while Turner attempted to "strike a deal"

with Plaintiff that if he submitted to a beating and did not report it, Turner would not

file a disciplinary report against him or gas him (*id.* at 35–37; ECF No. 103 at 4–3).

The mental health counselor subsequently cleared Plaintiff for return to his cell and

turned him over to Defendant Lieutenant Turner (ECF No. 83-1 at 39–40).  Although

Plaintiff was under the impression that he was going to be returned to his regular cell,

---

[2] Plaintiff does not expressly state why he might have faced the threat of being sprayed with chemical agents, but he strongly suggests the threat was in response to an earlier incident in which he was charged with masturbating in the presence of a female officer (ECF No. 103 at 2–3).

[3] Plaintiff states he was never served with a disciplinary report for the alleged infraction (ECF No. 83-1 at 38).

he was instead taken to a different cell in the same dorm, Cell G3114, evidently so that he could be placed on "property restriction"  (ECF Nos. 83-1 at 40, 83-3 at 1).

Defendants provide affidavits from Defendants Turner, Mason and Reyes, as well as Officers Jeremiah Johnson and Lieutenant Travis Patt, to describe the use of force that ensued (ECF Nos. 83-3 through 83-7).  These affidavits are all factually similar.  Under Defendants' version of the facts, upon his arrival at Cell G3114, Plaintiff stated that he would not enter the cell and proceeded to lie on the floor (ECF No. 83-3 at 2).  As another officer, Jeremiah Johnson, observed Plaintiff's behavior and walked over to assist, Plaintiff refused Defendant Turner's order to stand up and would not otherwise respond (ECF Nos. 83-4 at 1; 83-3 at 2).  Along with an Officer Patt, Defendants Officer Mason and Lieutenant Reyes then arrived, and, during "counseling" by Reyes, Plaintiff was unresponsive except to say that he wanted to go to the medical department (ECF No. 83-3 at 2).  Reyes then ordered Plaintiff to stand so that he could be placed into the shower and then be seen by someone at the medical department (ECF Nos. 83-3 at 2; 83-7 at 2).  Plaintiff refused, and when Mason and Reyes then tried to bring Plaintiff to his feet, Plaintiff lunged at Turner, striking him in the chest with his head (*id.*).  A struggle ensued, with Plaintiff being forced to the floor and subdued by all the officers (ECF Nos. 83-3 at 2–3; 83-7 at 2).  Patt and

Reyes placed leg irons on Plaintiff, during which Plaintiff kneed Turner in the abdomen (ECF Nos. 83-3 at 3; 83-7 at 2). At that point, Plaintiff "ceased his combative behavior and all force ceased" (ECF No. 83-3 at 3).

Under Plaintiff's version of the facts, when he and Turner reached Cell G3114, Turner ordered Plaintiff to lie face down on the floor, and Plaintiff evidently complied (ECF No. 103 at 4). Plaintiff turned his head when he heard another voice, evidently Reyes', whereupon he was kicked "very hard" in the face, in the area of his right eye, by Reyes (ECF Nos. 37 at 8; 104 at 4; 83-1 at 48). Then: "Sometime later, while I was laying on the floor handcuffed behind my back and was not breaking any prison rules, Reyes, Turner, Mason and Patt assaulted me, beat me up, and tried to push me in Cell G3114" (ECF No. 103 at 4). Plaintiff specifies that Defendants kneed him in the back, grabbed and twisted his arms (ECF No. 83-1 at 52–54). Plaintiff further states that he did not lunge at or strike Turner and did not resist or hit anyone at any time during the incident (ECF No. 103 at 5). Plaintiff asserts that Defendants assaulted him "due to their belief that the Plaintiff was masturbating at a nurse the day before the beating" (ECF No. 103 at 5). Further, Plaintiff at no time stated that he wanted to go to the medical department, nor did Reyes make any contact with the medical department in that regard (ECF No. 103 at 4). After the incident, Plaintiff

was taken to one of the showers "in great pain," and then taken to medical in a wheelchair (ECF No. 103 at 4). Plaintiff subsequently was returned to Cell G3114 whereupon he evidently entered the cell without incident.

As documentary evidence of the uses of force, Defendants have submitted "fixed wing" video footage showing Plaintiff being escorted to Cell G3114 on the morning in question (ECF No. 88, ex. I). Upon arrival at the cell, the footage shows Plaintiff kneeling and then lying on the floor at the front of the cell door, although there is no audio from which to determine whether he was ordered to lie down. While other officers gather around the area and around Plaintiff, at no point do any of the officers appear to kick or strike Plaintiff. Several officers do attempt to bring Plaintiff to his feet, whereupon a skirmish ensued. It is not certain from the footage, which is from a distance, whether the skirmish developed from Plaintiff lunging at Defendant Turner, as Defendants assert, or whether Plaintiff simply fell or slumped to the to the floor. In any event, the skirmish appears only to involve the officers gaining control over Plaintiff on the floor, after which Plaintiff is escorted away without incident. Again, no punches or kicks appear to be thrown, and no overt force appears to be used beyond the fact that the officers essentially grabbed Plaintiff, applied force and their own body weight upon Plaintiff in order to gain control over him.

Defendants also submit video footage from a hand-held camera showing Plaintiff being escorted to the medical unit for evaluation, to the shower, and then back to his cell, without physical altercation beyond the fact that officers had to hoist Plaintiff out of the wheelchair when necessary to move him (ECF No. 88, ex. J). Plaintiff appeared slumped in the wheelchair throughout.

While in the medical unit, Plaintiff was seen by a Nurse Moore, whom Plaintiff alleges "found his lower back, left forearm and left wrist to be broken" (ECF No. 37 at 8). Plaintiff indicates that Nurse Moore told him as much during the examination (ECF No. 102 at 9). Plaintiff reports that Nurse Moore indicated to him, and to the officers who were to transport him to the showers, that Defendant Nurse Nichols would conduct a second assessment of his injuries (ECF No. 102 at 9). Plaintiff states that Nichols examined him, and while Plaintiff showed her what he stated were his fractures, Nichols "ignored Plaintiff's medical complaints, callously disregarded his obvious injuries, completely denied him readily available treatment for his serious medical needs . . . and 'cleared' Plaintiff to return to his confinement cell" (ECF No. 37 at 9). Plaintiff states that he never received adequate treatment for his broken bones, leaving him in great pain and unable to turn properly (ECF Nos. 37 at 9, 11; 102 at 9, 11). He thereby deems himself "permanently disabled" (ECF No. 37 at 9).

Defendants assert that Plaintiff suffered no injury other than a "superficial scrape" on Plaintiff's ankle, as a result of the January 27 use of force (ECF No. 83-8 at 8–9, 96–99). Defendant Nurse Nichols attested that Nurse Moore's examination of Plaintiff "did not reveal any injuries which would require a referral" to her or to a physician, and consequently Plaintiff saw no one in medical that day other than Nurse Moore (ECF No. 73-1 at 1). While Nurse Nichols did "sign off" on the records generated by Nurse Moore, Nurse Nichols's review "occurred on February 23, 2015, and was done as a usual practice, to ensure the forms were used correctly" (*id.*; ECF No. 83-8 at 97).

Defendants also note that Plaintiff was seen on February 23, 2015, claiming pain in his left forearm, left wrist, mid low back, sternum, index and middle fingers on his left hand, and right eye, all of which he attributed to the incident of January 27 (ECF No. 83-8 at 10–11). Again, no injuries were noted upon physical examination, and no treatment was indicated (*id.*). On March 11, 2015, Plaintiff was seen by Nurse Moore at sick call, where he complained of severe back pain which he attributed to the use of force incident in January. Plaintiff requested that he be supplied with a wheelchair even if only on a temporary basis (ECF No. 83-8 at 11–12, 123–27). While during physical examination Plaintiff was noted to express extreme pain upon

palpation of all parts of his sternum and back, Nurse Moore was informed that Plaintiff was walking normally in his cell and while being escorted to the medical unit, and she noted him to be walking independently into the medical unit, albeit slowly (ECF No. 83-8 at 11–12, 124). No swelling, redness, bruising, or other abnormalities were noted in his sternum or back, and his breathing appeared normal (*id.*). Plaintiff was denied a wheelchair, but x-rays were arranged to rule out the possibility of injury.

On March 12, 2015, Plaintiff was seen by Nurse Moore for his complaint that he was "literally blind in [his] right eye since use of force in January" (ECF No. 83-8 at 12, 125). Plaintiff requested to be seen by a specialist to determine whether his vision could be restored. Plaintiff's eyes were examined, with the apparent result of 20/20 vision in his left eye and 20/70 vision in his right (ECF No. 83-8 at 13, 125). It was also noted that Plaintiff had been escorted to the medical unit that day without assistance and that he was able to ambulate around a corner and garbage cans without difficulty (*id. at 12*).

On March 20, 2015, Plaintiff was seen in sick call for complaints of back pain, for which he said that ibuprofen helped but subsequently stated that it did not work (ECF No. 83-8 at 14, 132). Although Plaintiff "moaned and groaned" to every touch

on all parts of his back, physical examination again revealed no discoloration, spasm, or swelling, and Plaintiff was able to bend at the waist without difficulty (*id.*).

Defendants also submit radiology reports dated March 25, 2015, in which x-rays of Plaintiff's left forearm, lumbar spine, and sacroiliac joints all returned normal results in proper anatomic alignment and without acute pathology (ECF No. 83-8 at 14, 134–41).

Thereafter, Plaintiff was then seen in the medical department on several occasions for complaints of back pain, with similar observations from medical personnel, similar results from physical examinations, and similar recommendations for conservative treatment (ECF No. 83-8 at 14–16, 142–67). Plaintiff also complained about his eyes during an April 17, 2015, sick call, but this involved an incident unrelated to this litigation wherein Plaintiff alleged he was poked in the eye by another inmate (*id.* at 15, 154–55).[4]

IV.   ANALYSIS

A.   Excessive Force Claim

---

[4] It should also be noted that Defendants submit medical records indicating that in January of 2014, approximately one year before the use of force incident in question, Plaintiff claimed that he was unable to see out of his right eye following an alleged incident in which he was struck in the right eye (ECF Nos. 82 at 17; 83-8 at 6). A visual acuity tests produced results roughly akin to those produced in 2015 (ECF No. 83-8 at 6). In fact, Plaintiff's visual test results had been essentially the same dating back to 2012 (*id*. at 5–6).

Case No.: 3:15cv202/LAC/EMT

Claims of excessive force by prison officials fall under the Eighth Amendment's proscription against cruel and unusual punishment. The standard applied to Eighth Amendment claims has a subjective and an objective component. Under the subjective component, to sustain an Eighth Amendment challenge it must be shown that prison officials' actions amounted to an "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084, 89 L. Ed. 2d 251 (1986). "Force is deemed legitimate in a custodial setting as long as it is applied 'in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm.'" Skrtich v. Thornton, 280 F.3d 1295, 1300 (11th Cir. 2002) (quoting Whitley, 475 U.S. at 320–21). In determining whether an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force; the relationship between that need and the amount of force used; the extent of the threat to the safety of staff and inmates, as reasonably perceived by officials; the extent of injury; and any efforts made to temper the severity of the response." Hudson v. McMillian, 503 U.S. 1, 7–8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992); *see also* Whitley, 475 U.S. at 321; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999). Although the absence of serious injury is relevant to an excessive force claim, the core

judicial inquiry is not whether some quantum of injury was sustained but rather whether force was applied in a good-faith effort to maintain or restore discipline or whether it was applied maliciously and sadistically to cause harm.  *See* Wilkins v. Gaddy, 559 U.S. 34, 37–38, 130 S. Ct. 1175, 1178–79, 175 L. Ed. 2d 995 (2010); *see also* Hudson, 503 U.S. at 4.

From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  Whitley, 475 U.S. at 321 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)).  That officials followed prison regulations in administering force or restraint provides evidence that they acted in good faith and not to inflict pain. Campbell, 169 F.3d at 1376 (citation omitted).

The Court in Whitley set out the following as applicable to the inquiry:

> courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives.  Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain under the standard we have described, the case should not go to the jury.

Whitley, 475 U.S. at 322 (emphasis added).

Thus, the reasonable use of physical force in order to enforce compliance with institutional rules does not violate the Eighth Amendment.  Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990); Ort v. White, 813 F.2d 318, 324–25 (11th Cir. 1987).  "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." Bennett, 898 F.2d at 1533; Campbell v. Sikes, 169 F.3d 1353, 1375 (11th Cir. 1999).  Officials may also take action when in their professional judgment the safety of the guards and the other inmates is placed in jeopardy.  Campbell, 169 F.3d at 1375; Sims v. Mashburn, 25 F.3d 980, 985 (11th Cir. 1994).  Courts must give a "wide range of deference to prison officials acting to preserve discipline and security," including when considering "[d]ecisions made at the scene of a disturbance." Cockrell v. Sparks, 510 F.3d 1307, 1311 (11th Cir. 2007) (quoting Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir.1990)).

In addition to the "unnecessary and wanton infliction of pain" standard, referred to as the "subjective component" of the excessive force standard, there exists an "objective component" that determines if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.  See Wilson v. Seiter, 501 U.S. 294, 303, 111 S. Ct. 2321, 2326, 115 L. Ed. 2d 271 (1991).  In situations involving

allegations of excessive force, the Supreme Court has abrogated any requirement that the resulting injury be "significant." Hudson, 503 U.S. at 9. However, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Id.* (quotation omitted). "[Excluded] from constitutional recognition [are] de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.*, 503 U.S. at 9–10 (quotation marks and citation omitted); Nolin v. Isbell, 207 F.3d 1253, 1258 (11th Cir. 2000) ("[A] minimal amount of force and injury . . . will not defeat an officer's qualified immunity."). The Eleventh Circuit has repeatedly held that a push or shove that causes pain and necessitates no or merely minor medical treatment is not a constitutional violation, even where the prisoner was restrained and no further force was necessary. *See, e.g.*, Jones v. City of Dothan, 121 F.3d 1456, 1460–61 (11th Cir. 1997); Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994). Furthermore, a conclusory allegation that the prisoner suffered serious injury should be discounted, and the absence of further evidence of injury justifies the conclusion that the use of force on the prisoner was minimal. Brown v. Smith, 813 F.2d 1187 (11th Cir. 1987); Bennett v. Parker, 898 F.2d 1530, 1533 (11th Cir. 1990).

In contending that excessive force was used upon him, Plaintiff asserts that he did not lunge at Defendant Turner or otherwise strike him.   The video footage provided by Defendants is not particularly probative in this regard as it is not clear enough to show whether or to what degree Plaintiff might have lunged at Defendant Turner.   Accordingly, although Defendants maintain that Plaintiff did lunge at Defendant Turner, under summary judgment review the court must resolve factual issues in the favor of Plaintiff and find that Plaintiff did not.

However, Plaintiff alleges that Defendants used excessive force, "beating him up" such that Plaintiff broke his bones, or such that Plaintiff was injured to the extent that he believed his bones were broken.  Here the video footage contradicts Plaintiff's assertions.  The video does not show any accelerated movement that might resemble a kick or a thrown fist; it only shows the officers holding onto him and grappling with him while trying to gain control over him on the floor.

Moreover, the medical evidence submitted by Defendants, the affidavits from medical personnel, the records of medical visits, and the results of medical testing, all demonstrate that Plaintiff did not receive any fractures or any other sort of serious injury from the use of force.  Additionally, while Plaintiff's visual acuity test did not exactly return normal results, the results were a far cry from the blindness that

Plaintiff alleged.   While it is true that Plaintiff received ibuprofen and other conservative medication for his reported back pain and the like, there is no evidence to show that any of these ailments were considered a consequence of the use of force incident.   Thus, as Plaintiff provides only conclusory statements that  he received significant injuries, statements that are entirely non-credible in light of the evidence, the court finds his injuries to be minimal.

Another important aspect of the video footage supplied by Defendants is that it shows Plaintiff resisting orders from the officers to enter his cell, and after that, resisting orders to stand, so that he could be escorted.   Again, it is unclear whether Plaintiff lunged at Defendant Turner or otherwise *aggressively* resisted, but his resistance is nevertheless clear.   After all, had Plaintiff not resisted, he would have stood up upon being directed to do so, or at least he would have cooperated while the officers attempted to pick him up and raise him to his feet.[5]   This he did not do, and to this extent it is clear that Plaintiff resisted.   Defendants could legitimately use physical force in order to enforce compliance with institutional rules.   *See* Bennett; Ort, *supra*.

---

[5]  Plaintiff does not contest Defendants' assertion that the officers ordered him to stand, and it is nevertheless abundantly clear from the video that that was the officers' intent.

Case No.: 3:15cv202/LAC/EMT

In sum, the court finds that Plaintiff resisted the officers' instructions meant to enforce compliance with institutional rules.  Defendants thereafter subdued him, manoeuvring him onto the floor, and securing him for escort, which they were entitled to do.  Any question about the amount of force they used in doing so amounts at most to a dispute over the reasonableness of that force, which is not actionable under the Eighth Amendment.  Additionally, based upon the evidence of record, medical and otherwise, the court finds that the amount of force used upon Plaintiff was de minimis in nature.[6]

B.    Medical Indifference Claim

1.    Constitutional Claim of Deliberate Indifference

As is well settled, the government has a constitutional duty to provide minimally adequate medical care to prisoners.  <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1504 (11th Cir. 1991).  Medical treatment violates the Eighth Amendment "only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'"  <u>Id.</u> at 1505 (citing <u>Rogers v. Evans</u>, 792

---

[6] It bears noting that Plaintiff makes much of the fact that he filed grievances regarding the use of force incident and that one grievance was approved by the warden(ECF Nos. 102 at 12–13; 103 at 15–21).  However, review of these grievances reveals that Plaintiff's grievance to the warden was approved only insofar that Plaintiff was granted his request for the names of the officers involved in the use of force incident (ECF No. 103 at 21).  Thus, even if the grievance were to have probative value in this case, it is not even remotely as important or relevant as Plaintiff suggests.

F.2d 1052, 1058 (11th Cir. 1986)). Incidents of mere negligence or malpractice do not rise to the level of constitutional violations. *Id.* (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). Similarly, a difference in medical opinion between the medical staff and an inmate as to the inmate's diagnosis or course of medical treatment does not support a claim of cruel and unusual punishment. *Id.* (citations omitted).

Stating an Eighth Amendment claim of denial of adequate medical care requires satisfying both an objective and subjective component. Taylor v. Adams, 221 F.3d 1254, 1257 (11th Cir. 2000). First, there must be conduct by prison officials which, objectively speaking, is "sufficiently serious" to constitute a deprivation "'denying the minimal civilized measure of life's necessities.'" *Id.* (quoting Wilson, 501 U.S. at 298 (internal quotation omitted)). Second, the prison officials must possess a subjective intent to use the medical deprivation as a means of punishment. *Id.* (citations omitted).

Both the objective and subjective components encompass two subsidiary requirements. Taylor, 221 F.3d at 1258. As to the objective prong, an objectively serious deprivation requires showing an objectively "serious medical need." Estelle, 429 U.S. at 104. A serious medical need is "one that has been diagnosed by a

physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Hill v. DeKalb Regional Youth Detention Center, 40 F.3d 1176, 1186 (11th Cir. 1994); *see* Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In addition, an objectively serious deprivation requires showing the response made by Defendants to that need was so deficient as to constitute "an unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 105–06 (internal quotation marks omitted); *see* Taylor, 221 F.3d at 1257; *see also* Adams v. Poag, 61 F.3d 1537, 1543–44 (11th Cir. 1995).

To show the required subjective intent to punish, Plaintiff must demonstrate that Defendants acted with an attitude of "deliberate indifference." Estelle, 429 U.S. at 105. "Deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Farrow v. West, 320 F.3d 1235, 1245–46 (11th Cir. 2003) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999) and Taylor, 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious

need" and that his response must constitute "an objectively insufficient response to that need")).

A complete denial of readily available treatment for a serious medical condition constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris, 941 F.2d at 1507 (quoting Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted). The medical official must be consciously aware of the medical condition and the need for effective treatment and then callously or recklessly disregard it. See McElligott v. Foley, 182 F.3d 1248, 1257-58 (11th Cir. 1999). Ordinarily, there is no constitutional violation when some measure of treatment is provided. Id. at 1259; see also Harris v. Thigpen, 941 F.2d 1495, 1504–05 (11th Cir. 1991). However, if the official knew that the present course of treatment went beyond a medical judgment call and was tantamount to no treatment at all, then an Eighth Amendment claim would exist. Id. at 1257–58.

While Defendant Nichols in this case asserts that she never had a medical visit with Plaintiff on the day of the incident, Plaintiff maintains that she did.[7] This seems an awkward dispute of the facts, but nonetheless, for purposes of summary judgment, the court will accept Plaintiff's version of the facts. Thus the court takes as true that on the day of the use of force incident, Defendant Nichols ignored Plaintiff's complaints that his wrist, forearm, and back were fractured and denied him treatment.[8]

Nonetheless, this does not establish that Plaintiff actually had serious medical needs that demanded medical attention. To the contrary, as is well established in the record, Plaintiff's alleged injuries were not at all verified through medical observation and testing, neither on the day of the incident nor in the months that followed. In fact, nearly the opposite is established; Plaintiff's injuries were shown to be minimal and

---

[7] The court recognizes that Plaintiff failed to file a response to Defendant Nichols' motion for summary judgment. Defendants assert that for this reason alone Plaintiff's claims against her could be dismissed under the court's inherent authority to enforce its own orders (ECF No. 87). However, it is generally considered that the court should not grant summary judgment simply because motion was unopposed but should consider the merits of the motion, albeit without the benefit of a response from Plaintiff. *See* Howard v. Gee, 538 F. App'x 884, 891 (11th Cir. 2013) (citing United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla., 363 F.3d 1099, 1101 (11th Cir. 2004)).

[8] This construction of the facts essentially renders as moot Plaintiff complaint that there existed video footage of his visit with Nichols but that Defendants must have excised it, along with his contention that the video was not authenticated and that, had he the resources, he would have been able to hire an expert to demonstrate that the video footage had been tampered with (ECF No. 102 at 15, 25–26). Noted for the record, however, is Defendants' contention that the video was readily capable of being authenticated should such be needed for trial (ECF No. 109 at 6–7).

to be manageable with conservative treatment.[9]  His issues with vision and with back and forearm pain, which were largely only subjectively reported, were treated as simple, chronic problems.  No nexus was drawn between these medical needs and the use of force incident.  The only suggestion in the record that Plaintiff had serious injuries resulting from the incident were derived from Plaintiff's own conclusory statements.  This is not sufficient.  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); see also Singletary v. Vargas, 804 F.3d 1174, 1183 (11th Cir. 2015) ("Given the video evidence, Plaintiff's testimony cannot call into question Defendant's assertion that he was in the path of [a] car . . . .")).

---

[9]  The court notes that Plaintiff poses a challenge to the validity of the x-rays that were taken of his affected areas, but this challenge is unfounded.  Plaintiff claims the two-month delay in obtaining the x-rays renders the results suspect because Defendant Nichols "knows most fractures or cracks in one's bones will heal or disappear by that time" (ECF No. 102 at 11–12).  The court rejects this contention as a lay opinion devoid of factual basis.  Plaintiff also challenges Defendants' usage of an affidavit from Dr. Timothy E. Whalen, asserting that the affidavit was not based on personal knowledge as Dr. Whalen was not present during the altercations or the relevant medical examinations (ECF No. 102 at 26).  However, as Dr. Whalen provides, his affidavit is based upon his review of Plaintiff's medical records as well as Plaintiff's complaint, and his statements are limited to descriptions of those records (ECF No. 83-8 at 1–2).

Viewed in this light, the question of whether or not Defendant Nichols actually saw Plaintiff on the day of the incident is of little ultimate consequence. More important is the fact that, other than simple, conservative treatment, there is nothing in the record to show that Plaintiff had a serious medical need that Defendant Nichols ignored. Plaintiff received appropriate medical attention on an ongoing basis after the use of force incident. Thus, even if on the day in question Defendant Nichols had seen Plaintiff, Plaintiff does not establish that there was any sort of medical conclusion that Nichols might have drawn, or any sort of treatment that Nichols might have administered, that would have differed from what Nurse Moore had already provided right after the use of force. In other words, regardless of the extent of Nichols' involvement, Plaintiff does not demonstrate any deliberate indifference to a serious medical need.

## 2.    State Claim of Medical Negligence

Last, Defendant Nichols moves on procedural grounds for dismissal of Plaintiff's claim of medical negligence or malpractice under state law. Defendant contends that Plaintiff failed to abide by the required pre-suit investigation and notice procedures prescribed under Florida law.

Florida's Medical Malpractice Act, contained in Chapter 766, Florida Statutes (2016), sets out a complex pre-suit investigation and notice procedure that both a claimant and defendant must follow before a medical negligence claim may be filed in court. *See* Kukral v. Mekras, 679 So. 2d 278, 280 (Fla. 1996).  As part of this procedure, section 766.106(2), Florida Statutes (2016) provides that after completion of the pre-suit investigation pursuant to section 766.203 and prior to filing a claim for medical malpractice, a claimant shall notify each perspective defendant, and if any perspective defendant is a health care provider licensed under chapter 458, chapter 459, chapter 460, chapter 461 or chapter 466, the Department of Health by certified mail, return receipt requested, of an intent to initiate litigation for medical malpractice.

Section 766.203(2)(b), Florida Statutes (2016) also requires that corroboration of reasonable grounds to initiate medical negligence litigation shall be provided by the claimant's submission of a verified written medical expert opinion from medical expert at the time the notice of intent to initiate litigation is mailed.  The corroborating expert opinion requirement is designed to prevent the filing of a baseless litigation. *See* Fort Walton Beach Medical Ctr. Inc. v. Dingler, 697 So. 2d 575 (Fla. 1st DCA 1997); Archer v. Maddux, 645 So. 2d 544 (Fla. 1st DCA 1994).

In identifying those actions to which the required pre-suit notice and procedures apply, section 766.106(1)(a), Florida Statutes (2016) defines a claim for medical malpractice as a claim arising out of the rendering of or the failure to render, medical care or services. Sections 766.201–766.212, Florida Statutes (2016) concern pre-suit investigation and arbitration of medical negligence claims. Section 766.202(6), Florida Statutes (2016) defines medical negligence as medical malpractice, whether grounded in tort or in contract.

The Florida Supreme Court has held that Chapter 766, notice and pre-suit screening requirements apply to claims that arise out of the rendering of or the failure to render medical care or services. J.B. v. Sacred Heart Hosp. of Pensacola, 635 So. 2d 945, 949 (Fla. 1994). The pre-suit requirements apply to incarcerated plaintiffs, O'Hanrahan v. Moore, 731 So. 2d 95 (Fla. 4th DCA 1999); Okaloosa County v. Custer, 697 So. 2d 1297 (Fla. 1st DCA 1997), and they apply to cases filed in federal court. McMahan v. Toto, 256 F.3d 1120 (11th Cir. 2001); Woods v. Holy Cross Hosp., 591 F.2d 1164 (5th Cir. 1979) (applying the Erie doctrine to hold that the Florida medical malpractice pre-suit procedures must be followed in federal court); Clark v. Sarasota County Public Hosp. Bd., 65 F. Supp. 2d 1308, 1314 (M.D. Fla. 1998).

Plaintiff does not respond or otherwise indicate that he complied with any of these pre-suit procedures; for that reason his claim based on state medical negligence or malpractice against Defendant Nichols is subject to dismissal. As Defendant Nichols indicates, since Plaintiff's allegations concern events occurring in 2015, the two-year statute of limitations applicable to medical negligence actions has clearly passed, and with it any chance that Plaintiff might have had to cure the failure of notice (ECF No. 70 at 12).

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1.    That the Motions for Summary Judgment filed by Defendant Nurse Practitioner Marsha Nichols (ECF No. 70) and by Defendants Lieutenant Peter Reyes, Captain Brandon Turner, and Officer Virgil Mason (ECF No. 82) be **GRANTED**;

2.    That all other pending motions be **DENIED** as moot; and

3.    That the clerk be directed to enter judgment in favor of all Defendants and close the file.

At Pensacola, Florida, this <u>14</u><sup>th</sup> day of January 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**